## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CRYSTAL HATCHETT,<br>o.b.o. L.F. | ) | Case No. 1:20-cv-0237 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| ANDREW SAUL, Commissioner<br>of Social Security | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant. | ) | REPORT AND RECOMMENDATION |

## I.      Introduction

Crystal Hatchett, on behalf of minor L.F., Plaintiffs (collectively, "Claimants"), seek judicial review of the final decision of the Commissioner of Social Security, Andrew Saul, denying Claimants' application for supplemental security income for a minor under Title XVI of the Social Security Act. This matter is before me under 42 U.S.C. § 405(g), 42 U.S.C. § 1383(c)(3), and Local Rule 72.2(b). Because the ALJ followed proper procedures and her decision is supported by substantial evidence, I recommend that the Commissioner's final decision denying Claimants' application for supplemental security income be AFFIRMED.

## II.     Procedural History

Claimants filed for supplemental security income on June 16, 2017, for a period of disability beginning on October 28, 2009. (ECF No. 10 at 97). The Ohio Division of Disability Determination (the "State Agency") initially denied Claimants' claim on August 29, 2017, and denied it again at the reconsideration stage on November 6, 2017. (ECF No. 10 at 97). Claimants requested a hearing before an ALJ. (ECF No. 10 at 97). ALJ Penny Loucas presided over

Claimants' hearing on April 30, 2018.[1] (ECF No. 10 at 97). Claimants appeared with counsel, and both Hatchett and L.F. testified. (ECF No. 10 at 116-65). The ALJ issued her decision on September 5, 2018, in which she determined that L.F. was not disabled under the Social Security Act. (ECF No. 10 at 97-111). Claimants asked the Appeals Council to review and set aside the ALJ's ruling, but the Appeals Council denied Claimants' request on December 11, 2019. Thus, Claimants' administrative decision was final as of that date. (ECF No. 10 at 5-11). This timely appeal followed. (ECF No. 1).

## III.    Relevant Background

The ALJ's narratives of the relevant hearing testimony, medical evidence, and opinion evidence provide useful background in this case. The Court augments the facts at issue in the analysis section below as is necessary to address the parties' arguments.

### A.    Hearing Testimony

At the hearing, the claimant's mother, Ms. Hatchett, testified that the claimant was having trouble with attention in school. She testified that the claimant was behind a grade level in his studies. She testified that being able to follow through on tasks at home was an issue for the claimant. She also testified that the claimant cannot tie his shoes or button his pants. The claimant's mother testified that the claimant is in special education classes at school and that he was in speech therapy for five or six years, since he started talking. Ms. Hatchett testified that the claimant does not believe what she says. She testified that she constantly has to tell him to stop running in the street and to stop running in the parking lot. Ms. Hatchett testified that the claimant has friends at school but does not have friends outside of school. She testified that the claimant has issues hanging out with other kids, because he does not know when he has soiled himself. She testified that he does not know if he has poop stains on him and that he does not know how to wipe himself. Ms. Hatchett

---

[1] The Court notes that Claimants appeared before the ALJ on two separate issues: (1) L.F.'s disability status under the listings; and (2) Hatchett's obligation to remit certain overpayments related to L.F.'s disability status. (*See* ECF No. 10 at 116-65). Claimants raise issues related only to L.F.'s disability status; thus, the Court addresses only the procedural facts that are relevant to that dispute here.

testified that the claimant wore diapers and that he requires an enema every week, because he cannot poop without help. She testified that the claimant wears a weighted vest to calm him down so that he can focus on the task at hand. She finally testified that the claimant will not cooperate when she tries to help him with his homework. (Hearing).

The claimant testified that he plays Minecraft. He testified that he can basically build a whole underground, his secret place. He testified that he can build houses out of blocks and other things. He testified that he can make his own creatures. The claimant testified that he does not think there are any books in Minecraft. He testified that he reads Captain Underpants. He testified that the principal took off his hair, and he was bald in the Captain Underpants book. He testified that when they put water on the principal, he turns into mean principal Crump. (Hearing)…

The claimant's mother testified that the claimant was having trouble with attention in school. However, the claimant's teacher described the claimant as being a good listener and a hard worker. (12E/3) The claimant's mother testified that the claimant requires an enema every week, because he cannot poop without help. However, the claimant's mother was aware that when she and the claimant followed the behavioral and medication plan, the claimant did well, but they were not always consistent with the plan. (7F/8)

(ECF No. 10 at 102-03).

## B. Medical Evidence

The claimant underwent treatment at University Hospital and the Center for Living Effectively for ADHD and autism. (lF, 4F, 6F). On May 20, 2016, the claimant was diagnosed with autism spectrum disorder and ADHD. (1lE/36). Less than a month later, on June 2, 2016, the claimant presented for treatment of ADHD and autism. The claimant's social issues included playing by himself and not initiating play with others. He had difficulty sitting still and did not easily listen. The claimant was distractible and impulsive. It was noted that the claimant avoided homework and needed supervision to be completed. (lF/4). However, it was noted that the claimant took Adderall with a 50 percent improvement in his attention span and ADHD features. (lF/4). During a mental status exam, the claimant was alert and interactive. He was also oriented to person, place, and time. He had normal attention and concentration; fluent, spontaneous speech; good eye contact and interaction; intelligible speech; a friendly demeanor; and a good sense of humor. (lF/6). It

was noted that the claimant had an absence of restricted interests or repetitive behaviors. The claimant's treatment provider did not find any features in support of a diagnosis of autism in the claimant's treatment history or in his presentation during this office visit. (1F/7).

On November 3, 2016, the claimant was assessed with ADHD. It was noted that the claimant's ADHD was not well controlled, and his plan of treatment was medication management. (1F/3). From November 2016 to June 2017, the claimant appeared less focused than usual during his therapy session on one occasion, and on another occasion, the claimant struggled to listen to simple directions and needed instructions repeated. (4F/6, 11). Despite those assessments, the claimant had a euthymic mood and a congruent affect, and he was engaged and actively participated throughout multiple therapy sessions. (4F/4, 6, 7, 9, 12, 15, 19, 21, 27).

On June 2, 2017, the claimant presented to a therapy session with a euthymic mood and a congruent affect. A game of Checkers was utilized to observe the claimant's memory and ability to concentrate. The claimant had to be reminded of the direction his pieces were allowed to move multiple times throughout the game. The claimant became upset after losing the game; however, he returned to a euthymic mood after he was allowed to color. (6F/1). Months later on January 11, 2018, the claimant's performance on the Wechsler Intelligence Scale for Children indicated that the claimant had the cognitive ability to access the general curriculum. (13E/4). In addition, the claimant's teacher described him as being social with all students, talkative with others, eager to please his teachers, and energetic. The teacher also described the claimant as being a good listener and a hard worker. (12E/3).

The claimant underwent treatment at the Cleveland Clinic Foundation for encopresis. (2F, 8F, 9F). In September 2015, the claimant had significant fecal impaction and was admitted for inpatient clean out after failing outpatient therapy. (2F/25, 31). On May 10, 2016, the claimant presented for treatment of constipation and encopresis. The claimant's mother reported that she had been calling the claimant in sick for the last few days of school; that the claimant had accidents multiple times a day; and that he did not feel the accidents or initiate bowel movements. (2F/10).

In October 2017, the claimant's mother reported that the claimant had struggled with constipation since birth and that he did not know how to poop. She reported that the claimant had been on a strict

4

bowel regimen over the summer, taking three caps of Miralax daily, but he stopped taking them when he started school. The claimant's mother also reported that the claimant had little success with enemas, because he knew how to stop them by pushing them back out with little stool. His mother reported that his last full bowel movement was two months prior. The claimant was admitted for fecal impaction and a clean out. (8F/6). On physical examination of the gastrointestinal system, stool mass was palpable in the claimant's lower abdomen. On the other hand, the claimant's abdomen was soft and nontender. (8F/3). The claimant was assessed with chronic functional constipation and encopresis. (8F/8).

On November 8, 2017, the claimant presented for ongoing evaluation and treatment of chronic constipation and encopresis. It was noted that the claimant had been passing a small amount of stool at home each time he was asked to sit on the toilet, which was in the morning, during school, and after school. (9F/1). The claimant's mother stated that as long as they stuck to this routine, the claimant did well. (9F/7). However, it was noted that they were not always consistent with the routine, and the claimant continued to have soiling of the underwear. (9F/1, 8). The claimant had a moderate amount of stoo[l] on rectal examination but less stool than he had during the previous examination. (9F/3). On physical examination of the gastrointestinal system, the claimant's abdomen was soft and nontender. (9F/2). The claimant took medication and enemas as treatment. (9F/3).

(ECF No. 10 at 103-04).

## C.    Opinion Evidence

As for the opinion evidence, State agency medical consultants, Frank Stroebel, MD, and Bruce Mirvis, MD, and State agency psychological consultants, Cynthia Waggoner, PsyD, and Irma Johnston, PsyD, opined that the claimant has less than marked limitation in acquiring and using information; less than marked limitation in attending and completing tasks; less than marked limitation in interacting and relating with others; less than marked limitation in moving about and manipulating objects; a less than marked limitation in caring for yourself; and less than marked limitation in health and physical well-being. (2A/6-7; 4A/7-8). The undersigned grants this opinion great weight, because it is consistent with the record as a whole…

The claimant's teacher at Brookview Elementary School opined that the claimant has problems attending and completing tasks and

caring for himself but no problems interacting and relating with others or moving about and manipulating objects. (5E/4-7)…

(ECF No. 10 at 104-05).

## IV.    The ALJ's Decision

As is relevant here, the ALJ issued the following findings of fact and narrative analysis:

5. …

a. Acquiring and Using Information…

The claimant has less than marked limitation in acquiring and using information. The claimant's mother reported that the claimant has difficulty with completing multi-step self-care tasks without lots of reminders or verbal cues. She also reported that the claimant had difficulty paying attention. (7F/4). The claimant scored in the 27th percentile for his age on the Berry Developmental Test of Visual Motor Integration, which meant that 73 percent of children his age scored higher than he did. (7F/5). In addition, the claimant demonstrated educational needs in the area of written expression that required specially designed instruction. (3F/41). Furthermore, the claimant's teacher, Ms. Uhlik, reported that the claimant struggled reading text on his level. (12E/3). On the other hand, the claimant spelled his name and his therapist's name. (7F/29). It was noted that the claimant's strengths included the ability to interpret spoken sentences of increasing length and complexity. (3F/41). At the hearing, the claimant testified that he enjoyed reading a book about Captain Underpants. (Hearing). On the claimant's Individualized Education Plan, it was noted that the claimant had average cognitive skills that should allow him to successfully access the general education curriculum. (3F/2). Finally, during a doctor's appointment, the claimant identified letters, drew age-appropriate figures, and had an understanding of ordinal counting, greater and lesser, and simple addition. (1F/7). Therefore, the claimant has less than marked limitation in acquiring and using information…

e. Caring for Yourself…

The claimant has less than marked limitation in the ability to care for himself. The claimant's mother reported that the claimant expressed discomfort during grooming tasks. (7F/4). The claimant was admitted to the hospital for fecal impaction and a clean out. (8F/6). The claimant also had soiling of the underwear. (9F/1). The claimant's mother reported that she has to help him wipe his bottom.

(7F/5). On the other hand, the claimant's mother reported that the claimant can physically do many of the dressing tasks. (7F/4). She also reported that bath time and the dressing routine were going well seven days a week as long as a routine was followed. (7F/23). Furthermore, the claimant had been passing a small amount of stool at home each time he was asked to sit on the toilet, which was in the morning, during school, and after school. (9F/1). Therefore, the claimant has less than marked limitation in the ability to care for himself…

(ECF No. 10 at 105-06, 109-10).

## V.     Law and Analysis

### A.      Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "It is well established that the party seeking remand bears the burden of showing that a remand is proper…" *Oliver v. Sec'y of Health and Hum. Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the

court does not agree with the Commissioner's decision, or substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."). Thus, the movant bears the burden of demonstrating that the ALJ's analysis *lacks* substantial evidence, not merely that substantial evidence supports her position, too. *See Greene ex rel. Greene v. Astrue*, No. 1:10-cv-414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010) ("[A] claimant does not establish a lack of substantial evidence by pointing to evidence … that supports her position. Rather, [a claimant] must demonstrate that there is not sufficient evidence … that would allow a reasonable mind to accept the ALJ's conclusion.").

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards—"fails to follow its own regulations"—unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). Legal error is not harmless if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* And the court will not remand a case for further administrative proceedings absent prejudice on the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold the ALJ's decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other

8

6th Circuit District Courts follow *Sarchet*'s logical-bridge requirement[2] because it ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.    Issues Presented**

Claimants raise one issue here: "Whether substantial evidence supports the ALJ's determination that L.F.'s impairments do not functionally equal the listings…" (ECF No. 13 at 1). The ALJ found that L.F. has *less than marked* limitations in each of the six functional-equivalence domains listed at 20 C.F.R. § 416.926a(b)(1)(i-vi). (ECF No. 10 at 105-11). Claimants focus on only two of the six functional-equivalency domains: (1) acquiring and using information; and (2) caring for yourself. (ECF No. 13 at 12 (citing to 20 C.F.R. §§ 416.926a(b)(1)(i, v))). Claimants

---

[2] *E.g. Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

ask the Court to reverse the ALJ's decision and award benefits or, alternatively, remand the claim for additional consideration, because "the ALJ erred as a matter of law that [L.F.]'s impairments did not result in … marked impairments" in both domains. (ECF No. 13 at 12-13). To that end, Claimants assert that the ALJ "selectively used only some of the evidence [in the record], did not properly credit the identified restrictions, and did not properly account for the severity of restrictions identified within the educational assessments and medical records," *i.e.*, that the ALJ parsed or cherry-picked the record. (ECF No. 13 at 12).

The Court addresses the relevant functional-equivalency domains separately below.

### C.    Parsing the Record

Claimants argue that the ALJ failed to address a significant portion of the medical records in reaching her decision. (ECF No. 13 at 11-18). The regulations compel ALJs to "consider all evidence available in [an] individual's case record." 42 U.S.C. § 423(d)(5)(B). But,

> an ALJ may not selectively include only those portions of the medical evidence that places a claimant in a capable light, and fail to acknowledge evidence that potentially supports a finding of disability. Courts have not hesitated to remand under such circumstances. *See*, *e.g.*, *Gentry* [*v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014)] (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson* [*v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008)] (finding error where the ALJ was "selective in parsing the various medical reports") *see also Williams v. Colvin*, 2017 WL 1319781 at * 16 (N.D Ohio Feb. 1, 2017), *report and recommendation adopted by*, 2017 WL 1304475 (N.D. Ohio April 7, 2017); *Ackles v. Colvin*, 2015 WL 1757474 at * 6 (S.D. Ohio April 17, 2015), *report and recommendation adopted by*, 2015 WL 2142396 (S.D. Ohio May 6, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light.") … *Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence. This is

10

> particularly so when the evidence ignored is from a treating
> physician.["]).

*Davidson v. Berryhill*, No. 16-cv-2621, 2017 WL 4682343, at 17 (N.D. Ohio Oct. 18, 2017).

At the same time, "it is well settled that …an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make 'explicit credibility findings' as to each bit of conflicting testimony, so long as his factual findings as a whole show that he 'implicitly resolve[d]' such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006); *accord Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Notably, there is a difference "between what an ALJ must consider and what an ALJ must discuss in a written opinion." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (endorsing the Third Circuit's analysis in *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (table), No. 00–1995 (3d Cir. Dec. 19, 2000) ("[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record."). Further, "'an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005) (quoting *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)). Similarly, the Sixth Circuit has noted that cherry-picking arguments can "cut[] both ways," as they may turn on whether the ALJ's decision falls within his "zone of choice" under substantial evidence review. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 285 (6th Cir. 2009). Indeed, what plaintiff-appellants have called cherry-picking "can [at times] be described more neutrally as weighing the evidence," and the claimant bears the burden of persuading the court "that the ALJ erred in conducting this difficult task." *Id.* at 284.

### D.    Child's Functional-Equivalency Framework

"A child who applies for supplemental security income is 'disabled' if the child is not engaged in substantial gainful activity and has a medically determinable physical or mental impairment or combination of impairments that results in 'marked and severe functional limitations.'" Soc. Sec. Ruling 09-03p, 2009 WL 396025, at *1 (Feb. 17, 2009) (quoting 20 C.F.R. § 416.906). The Commissioner will assess how a child-claimant can "function in [their] activities in terms of six domains," which "are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). A "[the child-claimant's] impairment(s) is of listing-level severity if [they] have 'marked' limitations in [at least] two of the [six] domains in paragraph (b)(1) …, or [at least one] 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(d). The Commissioner "will consider [the child-claimant's] functional limitations resulting from all of [their] impairments, including the [impairments'] interactive and cumulative effects." 20 C.F.R. § 416.926a(e)(1)(i). The Commissioner "will consider all the relevant information in [the child-claimant's] case record that helps [the Commissioner] determine [the child-claimant's] functioning, including [their] signs, symptoms, and laboratory findings, the descriptions [the Commissioner] ha[s] about [the child-claimant's] functioning from [their] parents, teachers, and other people who know [the child-claimant], and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929." 20 C.F.R. § 416.926a(e)(1)(i). The child-claimant must prove that they are disabled. 20 C.F.R. § 416.912(a).

A *marked limitation* "interferes seriously with [the child-claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A child-claimant's "day-to-day functioning may be seriously limited when [their] impairment(s) limits only one activity or when the interactive and cumulative effects of [their] impairment(s) limit

12

several activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.' It is the equivalent of the functioning [that the Commissioner] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i).

An *extreme limitation* "interferes very seriously with [the child-claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). This may be so even though their "impairment(s) limits only one activity or when the interactive and cumulative effects of [the child-claimant's] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(3)(i). "'Extreme' limitation also means a limitation that is 'more than marked.'" 20 C.F.R. § 416.926a(e)(3)(i). An extreme-limitation rating is the most severe, and it is reserved for "the worst limitations." 20 C.F.R. § 416.926a(e)(3)(i). But it "does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning [that the Commissioner] would expect to find on standardized testing with scores that are at least three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(3)(i).

### E. L.F.'s Ability to Acquire and Use Information

Concerning L.F.'s ability to acquire and use information, Claimants argue that "[t]he ALJ, in her analysis of the evidence, failed to address all the evidence of record, citing to only a few key pieces of evidence and interpreting them as proof of slight impairment." (ECF No. 13 at 15 (citing ECF No. 10 at 106)). Claimants assert that the ALJ's chosen evidence—"[L.F.] being able to spell his name, interpret spoken sentences, and read a book containing mostly pictures"—"cannot be the only evidence of age-appropriate functioning." (ECF No. 13 at 15 (citing ECF No. 10 at 106)). Instead, Claimants argue that "[t]he objective testing identified within the [Individualized Education Plan] and [Evaluation Team Report] demonstrate th[at] L.F. is functioning below grade

13

level, in addition to having to repeat a grade." (ECF No. 13 at 15).

In response, the Commissioner argues that the evidence that the ALJ relied on reasonably supports the ALJ's finding in this domain. (ECF No. 16 at 14-16). The Commissioner does so in three ways. First, the Commissioner argues that "Claimant[s]'s argument does not undermine the substantial evidence that supports the ALJ's decision, such as L.F.'s individualized education plan, the State Agency's consultants' opinions, and Claimants' trial testimonies. (ECF No. 16 at 14-16). Second, the Commissioner disputes Claimants' assertion that L.F. repeated the second grade, which the Commissioner believes arose because of "a scrivener's error." (ECF No. 16 at 16-17). And third, the Commissioner asserts that some of Claimants' evidence of inconsistencies is from "before the relevant period" of alleged disability and, thus, irrelevant here. (ECF No. 16 at 17 (citing ECF No. 13 at 14)).

### 1. SSR 09-03p—The Functional Equivalence Domain of Acquiring and Using Information

Under the ability-to-acquire-and-use-information domain, "a child's ability to learn information and to think about and use the information." SSR 09-03p, at *2. School records are "a significant source of information about limitations in" this domain, and "[p]oor grades or inconsistent academic performance are among the more obvious indicators of a limitation … provided they result from a medically determinable mental or physical impairment(s)." SSR 09-03p, at *3. Other school-related indicators that may demonstrate mental or physical limitations are the need for special education services; "occupational, physical, speech or language therapy, or psychological and counseling services"; or other relevant accommodations. SSR 09-03p, at *3. The Commissioner notes that it "assess limitations in this ability in all settings, not just in school"; thus, evidence that concerns "the child's ability to learn and think from medical and other non-medical sources (including the child, if the child is old enough to provide such information)" is

also relevant. SSR 09-03p, at *3.

SSR 09-03p provides "examples of typical functioning drawn from [its] regulations, training, and case reviews." SSR 09-03p, at *4. For school-age children between six to twelve years old, the ruling lists:

> • Learn[ing] to read, write, and do simple arithmetic.
>
> • Becom[ing] interested in new subjects and activities (for example, science experiments and stories from history).
>
> • Demonstrat[ing] learning by producing oral and written projects, solving arithmetic problems, taking tests, doing group work, and entering into class discussions.
>
> • Appl[ying] learning in daily activities at home and in the community (for example, reading street signs, telling time, and making change).
>
> • Us[ing] increasingly complex language (vocabulary and grammar) to share information, ask questions, express ideas, and respond to the opinions of others.

SSR 09-03p, at *5. The examples "are not all-inclusive… They are simply a frame of reference for determining whether children are functioning typically for their age with respect to acquiring and using information." SSR 09-03p, at *4. The ruling contrasts those typical developmental abilities with typical limitations, wherein the child:

> • Does not demonstrate an understanding of words that describe concepts such as space, size, or time (for example, inside/outside, big/little, morning/night).
>
> • Cannot rhyme words or the sounds in words.
>
> • Has difficulty remembering what was learned in school the day before.
>
> • Does not use [age-appropriate] language …
>
> • Is not developing 'readiness skills' the same as peers (for example, learning to count, reciting ABCs, scribbling).

15

• Is not reading, writing, or doing arithmetic at appropriate grade level.

• Has difficulty comprehending written or oral directions.

• Struggles with following simple instructions.

• Talks only in short, simple sentences.

• Has difficulty explaining things.

SSR 09-03p, at *6. These limitations do not reflect a specific age. SSR 09-03p, at *6. Moreover, though "drawn from [the Commissioner's] regulations and training[,] … [the listed limitations] are not the only limitations in this domain, nor do they necessarily describe a 'marked' or an 'extreme' limitation." SSR 09-03p, at *6.

### 2. The ALJ's Ability-to-Acquire-and-Use-Information Finding

The ALJ's finding of L.F.'s ability to acquire and use information is supported by substantial evidence. The ALJ's narrative first addresses facts that tend to show that L.F. is limited in this domain:

> [Hatchett] reported that the claimant has difficulty with completing multi-step self-care tasks without lots of reminders or verbal cues. She also reported that the claimant had difficulty paying attention. (7F/4). The claimant scored in the 27th percentile for his age on the Berry Developmental Test of Visual Motor Integration, which meant that 73 percent of children his age scored higher than he did. (7F/5). In addition, the claimant demonstrated educational needs in the area of written expression that required specially designed instruction. (3F/41). Furthermore, the claimant's teacher, Ms. Uhlik, reported that the claimant struggled reading text on his level. (12E/3).

(ECF No. 10 at 106). The ALJ then addresses facts that tend to demonstrate that L.F.'s limitations are less than marked or extreme:

> On the other hand, the claimant spelled his name and his therapist's name. (7F/29). It was noted that the claimant's strengths included

16

the ability to interpret spoken sentences of increasing length and complexity. (3F/41). At the hearing, the claimant testified that he enjoyed reading a book about Captain Underpants. (Hearing). On the claimant's Individualized Education Plan, it was noted that the claimant had average cognitive skills that should allow him to successfully access the general education curriculum. (3F/2). Finally, during a doctor's appointment, the claimant identified letters, drew age-appropriate figures, and had an understanding of ordinal counting, greater and lesser, and simple addition. (1F/7).

(ECF No. 10 at 106). After considering the facts in the record and assessing them either for or against a marked or extreme limitation, the ALJ concluded that L.F. "has less than marked limitation in acquiring and using information." (ECF No. 10 at 106).

The evidence that the ALJ relies on is substantial because a reasonable person might accept it as adequate support for a finding that L.F.'s limitations are not markedly limiting—that is, they do not interfere seriously with his ability to independently initiate, sustain, or complete activities. *Rogers*, 486 F.3d at 241. For example, L.F.'s discussion of Captain Underpants (a book series that L.F. reads) during the hearing (ECF No. 10 at 135-37), which the ALJ noted, demonstrates that L.F. uses appropriate—and appropriately complex—language. This cuts against the examples of serious limitations discussed in SSR 09-03p. Similarly, the ALJ was impressed with L.F.'s ability to explain the story. (ECF No. 10 at 137-38("[H]e's so verbal… I was quite impressed with him, that he was able to tell a story… and put it in chronological order…")). The ALJ is best poised to interpret and weigh a witness's in-person testimony. *Jones*, 336 F.3d at 475-76. In that light, the ALJ's conclusion draws a logical bridge between L.F.'s noted limitations and the less-than-moderately-limiting extent of those limitations. *Fleischer*, 774 F. Supp. 2d at 877.

Similarly, Claimant's assertion that the ALJ parsed the record here is unfounded. Claimants assert that the ALJ's "finding is in conflict with the substantial evidence" in the record. (ECF No. 13 at 13). But that is not the question before the Court; rather, it is whether the ALJ's analysis

lacks substantial evidence. *E.g. Greene ex rel. Greene*, 2010 WL 5021033, at \*4. Claimants' parse-the-record argument relies heavily on facts that concern L.F.'s reading and writing struggles, which are found in Exhibit 11E (L.F.'s Evaluation Team Report). (ECF No. 13 at 14). The ALJ sufficiently addressed these aspects of L.F.'s claim. For example, the ALJ discussed L.F.'s reading and writing struggles, noting that they demonstrate some limitations. (ECF No. 10 at 106 (citing to Exhibits 3F and 12E)). Claimants also state that L.F.'s need for an "intervention specialist, frequent breaks, small groups, redirection on testing, extending time, instructions read aloud and explained, frequent feedback, repetition, visual aids/manipulatives, and shortened assignments" are undiscussed limitations. (ECF No. 13 at 14). Not so. The ALJ sufficiently addressed these areas, too. For example, the ALJ noted that L.F. "demonstrated educational needs in the area of written expression that required specially designed instruction. (3F/41)." (ECF No. 10 at 106). Despite these statements from L.F.'s evaluation team, the ALJ noted that the evaluation team concluded in L.F.'s IEP that he "has average cognitive skills that should allow him to successfully access the general education curriculum." (ECF No. 10 at 106 (citing ECF No. 10 at 778)).

An ALJ is not required to recite every fact in his narrative analysis. *Kornecky*, 167 F. App'x at 507-08. And "an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Daniels*, 152 F. App'x at 489. Although the ALJ did not directly cite to the exhibit that Claimants focus on in this discussion, the Court is satisfied the ALJ considered the evidence in the record and assessed L.F.'s abilities within this domain accordingly, which fulfils his obligation. 42 U.S.C. § 423(d)(5)(B).

Even if substantial evidence supported Claimants' alternative weighing of the evidence, the ALJ still enjoys a "zone of choice" within which to decide close calls. *Mullen*, 800 F.2d at 545. Claimants have not demonstrated that the ALJ's finding lacks substantial evidence. *White*, 572

F.3d at 284. Indeed, Claimants' narrative and argument omits many facts that would cut against their argument that L.F. has a marked limitation in this domain, such as these statements from L.F.'s Evaluation Team Report: L.F. "does well in class"; "[he] stays attentive in class[] and answers questions promptly"; his "Full Scale IQ is 86"; "he seems to grasp" the material in a group-work setting; and his "social/emotional status are not expected to adversely affect his educational performance." (ECF No. 10 at 495-96).

Additionally, the Court notes the parties' dispute concerning whether L.F. repeated the second grade. (ECF No. 13 at 13, 15; ECF No. 16 at 16-17). This dispute perplexes the Court; it is unreasonable that Claimants would not know whether L.F. repeated the second grade. Despite Claimant's assertions in their brief to the contrary, the Court has little reason—none of which is convincing—to reject Claimants' counsel's representation at the administrative hearing that L.F. had not repeated any grades. (ECF No. 10 at 119-20 ("[L.F.] switched schools …, and with that type of consolidated care, he's been able to maintain [*sic.*] currently and hasn't had to repeat any grades.")). Nevertheless, the Court does not need to resolve this quarrel to report and recommend on the ALJ's analysis within this domain, as objective evidence of a claimant's cognitive limitations does not, on its own, establish that those limitations markedly affect the claimant. *See*, *e.g.*, *Dumas v. Astrue*, No. 09-cv-2493, 2010 WL 3326736, at *9 (N.D. Ohio Aug. 23, 2010) ("Although … [the claimant's] scores on achievement tests … show that he was performing below the level expected based on his I.Q. score [of 86], there is ample evidence that [he] was improving.").

Because the ALJ's finding in this domain is supported by substantial evidence, and because Claimants have not demonstrated that the ALJ parsed the record, the Court recommends that the ALJ's finding be affirmed.

F.      L.F.'s Ability to Care for Himself

Claimants again argue that the ALJ parsed the record concerning L.F.'s ability to care for himself. (ECF No. 13 at 16-18). Claimants argue that "a marked level of impairment in caring for [one's] self [can be] based on L.F.'s significant toileting difficulties alone." (ECF No. 13 at 18). Claimants also argue that L.F.'s autism-related behavioral symptoms show that he is markedly limited in this domain. (ECF No. 13 at 17-18).

1.      SSR 09-07p—The Functional Equivalence Domain of Caring for Yourself

The ability-to-care-for-oneself domain concerns "a child's ability to maintain a healthy emotional and physical state, [which] includes:

> • How well children get their emotional and physical wants and needs met in appropriate ways,
>
> • How children cope with stress and changes in the environment, and;
>
> • How well children take care of their own health, possessions, and living area.

Soc. Sec. Ruling 09-07p, 2009 WL 396029, at *2 (Feb. 17, 2009). More precisely, it "focus[es] on how well a child relates to self by maintaining a healthy emotional and physical state in ways that are age-appropriate and in comparison to other same-age children who do not have impairments." SSR 09-07, at *2.

Concerning a child's emotional wants and needs, "[c]hildren must learn to recognize and respond appropriately to their feelings in ways that meet their emotional wants and needs; for example, seeking comfort when sad, expressing enthusiasm and joy when glad, and showing anger safely when upset." SSR 09-07p, at *3. "For a school-age child, [an example is] playing a computer game when bored…" SSR 09-07p, at *3. In contrast, an inappropriate way for a child with ADHD

to "escape rather than problem solv[e]" could be "express[ing] frustration by destroying school materials." SSR 09-07p, at *3.

Concerning a child's physical wants and needs, "a child must be able to satisfy physical wants and needs every day." SSR 09-07p, at *3. It "involves the emotional ability to engage in self-care activities, such as feeding, dressing, toileting, and maintaining hygiene and physical health." SSR 09-07p, at *3. It also includes "[r]ecognizing when one feels ill; [s]eeking medical attention; [f]ollowing safety rules; [a]sking for help when needed; [r]esponding to circumstances in safe and appropriate ways, and [m]aking decisions that do not endanger oneself." SSR 09-07p, at *3-4.

A school-age child typically[3]

> • Recognizes circumstances that lead to feeling good and bad about himself.
>
> • Begins to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior.
>
> • Demonstrates consistent control over behavior and avoids behaviors that are unsafe.
>
> • Begins to imitate more of the behavior of adults she knows.
>
> • Performs most daily activities independently (for example, dressing, bathing), but may need to be reminded.

---

[3] As with SSR 09-03p, "[t]hese examples are not all-inclusive, and adjudicators are not required to develop evidence about each of them. They are simply a frame of reference for determining whether children are functioning typically for their age with respect to maintaining a healthy emotional and physical state." SSR 09-07p, at *5.

SSR 09-07p, at *5. But the following generalized examples[4] can demonstrate an impairment in this domain:

> • Consoles self with activities that show developmental regression (for example, an older child who sucks his thumb).
>
> • Has restrictive or stereotyped mannerisms (for example, head banging, body rocking).
>
> • Does not spontaneously pursue enjoyable activities or interests (for example, listening to music, reading a book).
>
> • Engages in self-injurious behavior (for example, refusal to take medication, self-mutilation, suicidal gestures) or ignores safety rules.
>
> • Does not feed, dress, bathe, or toilet self appropriately for age.
>
> • Has disturbance in eating or sleeping patterns.
>
> • Places non-nutritive or inedible objects in mouth (for example, dirt, chalk).

SSR 09-07p, at *6.

## 2. The ALJ's Ability-to-Care-for-Oneself Finding

As an initial matter, Claimants again state that "[s]ubstantial evidence supports" Claimants' argument. (ECF No. 13 at 18). But, as noted above, a claimant must demonstrate that the ALJ's finding lacks substantial evidence; establishing only that the ALJ could have concluded in the claimant's favor, too, does not carry the day. *White*, 572 F.3d at 284.

Beginning with Claimants' argument about L.F.'s chronic-functional-constipation and

---

[4] And as with SSR 09-03p, "These examples are drawn from our regulations and training. They are not the only examples of limitations in this domain, nor do they necessarily describe a "marked" or an "extreme" limitation … In addition, the examples below may or may not describe limitations depending on the expected level of functioning for a given child's age. For example, school-age children would be expected to bathe themselves, but toddlers would not; young children may place non-nutritive or inedible objects in their mouth, but older children typically would not." SSR 09-07p, at *6.

encopresis diagnoses, the ALJ narrated L.F.'s toilet difficulties. (ECF No. 10 at 103-04). Then, the

ALJ analyzed and narrated how L.F.'s diagnoses affect his ability to care for himself:

> The claimant's mother reported that the claimant expressed discomfort during grooming tasks. (7F/4). The claimant was admitted to the hospital for fecal impaction and a clean out. (8F/6). The claimant also had soiling of the underwear. (9F/1). The claimant's mother reported that she has to help him wipe his bottom. (7F/5).

(ECF No. 10 at 110). The ALJ then discussed the evidence that cuts against a finding that L.F.'s

diagnoses markedly or extremely limited him:

> On the other hand, the claimant's mother reported that the claimant can physically do many of the dressing tasks. (7F/4). She also reported that bath time and the dressing routine were going well seven days a week as long as a routine was followed. (7F/23). Furthermore, the claimant had been passing a small amount of stool at home each time he was asked to sit on the toilet, which was in the morning, during school, and after school. (9F/1).

(ECF No. 10 at 110). Concerning L.F.'s toilet routine, the ALJ also noted that Hatchett "stated that

as long as they stuck to this routine, the claimant did well. (9F/ 7). However, it was noted that they

were not always consistent with the routine, and the claimant continued to have soiling of the

underwear. (9F/1, 8)." (ECF No. 10 at 104).

A reasonable person might accept that analysis as adequate to support the conclusion that

L.F. has less than marked limitation in the ability to care for himself because it demonstrates that

L.F. could generally care for himself with minor encouragement and oversight. That conclusion is

reasonable for an eight-year-old child under the examples listed above. SSR 09-07p, at *5. Thus,

the ALJ relied on substantial evidence. *Rogers*, 486 F.3d at 241. Moreover, the ALJ's conclusion

draws a logical bridge between L.F.'s noted limitations and their less-than-moderately-limiting

extent. *Fleischer*, 774 F. Supp. 2d at 877.

Additionally, and as above, Claimants fail to show that the ALJ parsed the record.

23

Claimants' brief more thoroughly narrates L.F.'s chronic-functional-constipation and encopresis diagnoses than does the ALJ's. (*See generally*, ECF No. 13). But the ALJ is not required to "directly addressing in his written decision every piece of evidence submitted by a party," so long as her "factual findings as a whole show that [s]he 'implicitly resolve[d]'" any evidentiary conflicts. *Kornecky*, 167 F. App'x at 507-08. And "'an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" *Daniels*, 152 F. App'x at 489. Here, the ALJ discussed evidence that demonstrates L.F.'s limitations; she also discussed evidence that cuts against them. That satisfies her burden to consider all of the evidence in the record. 42 U.S.C. § 423(d)(5)(B). Thus, the Court concludes that the ALJ did not parse the record in this domain, either.

Concerning L.F.'s autism-related behavioral symptoms, which Claimants assert also demonstrate a marked limitation (ECF No. 13 at 17), the ALJ addressed this condition in her earlier analysis and factual narrative. (ECF No. 10 at 100-01, 103). Although she noted that L.F.'s autism was a severe impairment, the ALJ found that L.F.'s "autism does not meet listing 112.10 for autism spectrum disorder." (ECF No. 10 at 100-01). And the ALJ narrated the general evidence of L.F.'s autism diagnosis, stating in part that

> [d]uring a mental status exam, the claimant was alert and interactive. He was also oriented to person, place, and time. He had normal attention and concentration; fluent, spontaneous speech; good eye contact and interaction; intelligible speech; a friendly demeanor; and a good sense of humor. (lF/6). It was noted that the claimant had an absence of restricted interests or repetitive behaviors. The claimant's treatment provider did not find any features in support of a diagnosis of autism in the claimant's treatment history or in his presentation during this office visit. (1F/7).

(ECF No. 10 at 103).

Claimants' autism argument is self-defeating. On the one hand, Claimants point to testimony that "L.F. engages in self-harming behaviors, such as banging his head against the

24

couch, and then self-soothing, gyrating movements," and that L.F. "will throw[] things, yell, cry, and scream if his routine is broken[,] and [he] has difficulty asking for what he needs." (ECF No. 13 at 17). On the other, Claimants note that L.F. has learned "coping skills … [for] when he feels overwhelmed…, ways to identify and express basic feelings…, understand safety…, and utilize acceptable social skills…" (ECF No. 13 at 17). Claimants acknowledge that L.F.'s symptoms could be reasonably managed; thus, they do not markedly limit him because they do not "interfere[] seriously with [his] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). Moreover, and as the Commissioner notes, most of Claimants' evidence in support "predates the relevant period" for this case. (ECF No. 16 at 21 (listing the cited evidence that predates the relevant period)).

Because the ALJ's finding in this domain, too, is supported by substantial evidence, and because Claimants have not demonstrated that the ALJ parsed the record, the Court recommends that the ALJ's finding be affirmed.

## VI.    Recommendation

Because the ALJ followed proper procedures and her decision is supported by substantial evidence, I recommend that the Commissioner's final decision denying Claimants' application for supplemental security income for L.F. be AFFIRMED.

DATED: 1/19/2021

*Carmen Henderson*

Carmen E. Henderson
United States Magistrate Judge

_____

OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); see also *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).